Filed 7/29/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re EZEQUIEL G., et al., Persons Coming Under the Juvenile Court Law. | B314432 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. 18CCJP01205A) |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. CK87298F,G) |
| v. | |
| PRISCILLA S., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Stephen C. Marpet, Commissioner. Affirmed.

Robert McLaughlin, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Timothy M. O'Crowley, Deputy County Counsel for Plaintiff and Respondent.

———————————————

This juvenile dependency appeal is one of many in an increasingly common posture. There is no evidence in the juvenile court record—which began in 2017 and concluded with the termination of parental rights in 2021—that the three children at issue in this case are Indian children within the meaning of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1900 et seq.) and related state laws (Welf. & Inst. Code, § 224 et seq.).[1] To the contrary, the parents affirmatively represented below that they do not have Indian ancestry, and no parent objected either to the adequacy of the ICWA inquiry conducted by the Los Angeles County Department of Children and Family Services (DCFS) or to the juvenile court's finding that ICWA did not apply. Further, the appealing parent, Priscilla S. (mother), does not suggest on appeal that any of the information provided about the children's ancestry was in error or that she has uncovered new information after parental rights were terminated suggesting that the children are Indian children. Nonetheless, mother asks us to reverse the final order terminating parental rights because there are members of the children's extended family of whom an ICWA inquiry was not made.

Until very recently, Courts of Appeal routinely affirmed orders in this posture. Recently, however, some appellate courts have begun returning matters to the juvenile court—even after

---

[1] All subsequent undesignated statutory references are to the Welfare and Institutions Code.

Because ICWA uses the term "Indian," we will do the same for consistency, even though we recognize that "other terms, such as 'Native American' or 'indigenous,' are preferred by many." (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1.)

parental rights have been terminated—because an ICWA inquiry was not made of extended family members referenced in the juvenile court record.[2]

These reversals unquestionably delay permanency for some of the most vulnerable children in our juvenile court system. Worse, we believe the approach to reviewing ICWA error that drives these reversals is not mandated by the relevant statutes and is ineffective in protecting the interests of the Indian communities and families for whose benefit ICWA was enacted. For these reasons, we decline to follow our fellow appellate courts that return cases to the juvenile courts after parental rights have been terminated on the mere showing that an ICWA inquiry was not made of some members of a child's extended family. Instead, as we discuss more fully below, we will review a juvenile court's ICWA findings under a hybrid substantial evidence/abuse of discretion standard, reviewing for substantial evidence whether there is reason to know a child is an Indian child, and for abuse of discretion a juvenile court's finding that an agency exercised due diligence and conducted a "proper and adequate" ICWA inquiry. Further, we will reverse only on a showing that any ICWA error was prejudicial. Applying this standard here, we conclude that there is substantial evidence in the record to support the juvenile court's finding that the children are not

---

[2]     Some of these decisions characterize their dispositions as conditional reversals and others as conditional affirmances with directions. Because both kinds of dispositions have the effect of returning matters to the juvenile court, for simplicity we will refer to all of these dispositions as reversals, without distinguishing between conditional reversals and conditional affirmances.

3

Indian children, and the juvenile court did not abuse its discretion by concluding that DCFS exercised due diligence and conducted an adequate ICWA inquiry. We further conclude that mother has not shown that any error was prejudicial. We therefore will affirm the orders terminating parental rights.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The dependency proceedings.

Mother has ten children: Nic., Ni., and Na., whose father is R.V.; No., De., Na., Ra., and Unique, whose father is Randy C.; and Dominic and Ezequiel, whose father is Ezequiel G., Sr. This appeal concerns Unique, Dominic, and Ezequiel only.

In July 2017, a petition was filed on behalf of Na., No., De., Na., Ra., Unique, and Dominic, alleging physical abuse of the children by Ezequiel Sr. and domestic violence between mother and Ezequiel Sr. The seven children were detained from their fathers in July, and from mother in September 2017. In November 2017, the court sustained allegations of the petition pursuant to section 300, subdivision (b) and ordered the children removed from the parents.

Ezequiel was born in December 2017, and DCFS filed a dependency petition on his behalf in February 2018. In February 2018, the court detained Ezequiel from Ezequiel Sr. and ordered him placed with mother under DCFS supervision.

The juvenile court returned Unique and Dominic to mother's custody in 2018. However, in March 2019, the children were detained again after DCFS received a report of further domestic violence between mother and Ezequiel Sr. Dominic and Ezequiel Jr. were placed with maternal uncle, Malik B.; later that year, Unique also was placed with Malik.

4

In December 2020, the juvenile court terminated mother's and Ezequiel Sr.'s reunification services with respect to Unique, Dominic, and Ezequiel and set a section 366.26 hearing. On August 17, 2021, the juvenile court terminated parental rights as to Unique, Dominic, and Ezequiel. Mother timely appealed.

## B.    ICWA inquiry and findings.

Mother and Ezequiel Sr. were present at the July 2017 hearing concerning the detention of the older children, including Unique and Dominic. Both parents stated on the record that they did not have Indian ancestry as far as they knew, and mother filled out a Parental Notification of Indian Status (ICWA-020) form, in which she denied Indian ancestry. Randy was not present at the hearing, but the court stated there had been a finding in a prior DCFS case that he did not have Indian ancestry.[3] The court therefore found that it had no reason to know the children were Indian children.

Randy appeared at an August 21, 2017 hearing. He denied Indian ancestry on an ICWA-020 form and orally on the record.

At the February 23, 2018 hearing regarding Ezequiel's detention, mother again stated that she did not have Indian ancestry, and the court found that it did not have reason to know that Ezequiel was an Indian child.

During subsequent contacts between mother and DCFS, mother consistently denied that she had any Indian ancestry.

---

[3]    A prior dependency petition was filed in April 2011 on behalf of some of the older children. Juvenile court jurisdiction was terminated in May 2012, and mother was awarded sole legal and physical custody of the five children.

5

DCFS attempted to make further inquiry of Ezequiel Sr. and Randy Sr., but it was not able to make contact with either father.

Throughout the proceedings, DCFS was given contact information for and/or had contact with a variety of extended family members, including paternal grandmother Cynthia G., paternal aunt Kimberly G., paternal aunt Sara R., paternal cousin Sandy T., paternal uncle Christopher C. (Randy C.'s brother), paternal aunt Marina T., a paternal grandmother (Ezequiel Sr.'s mother), maternal cousin Manual P., maternal cousin Ralph P., and maternal uncle Malik. There is no indication in the record that an ICWA inquiry was made of any of these extended family members.

## DISCUSSION

Mother contends DCFS failed to make an adequate ICWA inquiry because it did not inquire of maternal uncle Malik, maternal cousin Ralph, and paternal aunt Kimberly. Mother urges this failure to make an adequate ICWA inquiry requires a conditional reversal with directions. For reasons not apparent from the record, mother does not allege that DCFS erred by failing to make ICWA inquiries of any of the other extended family members identified above (or to any other extended family members whose names may appear in the record but who are not specifically identified in this opinion), or that DCFS's failure to do so supports a conditional reversal.

DCFS contends that because the parents denied Indian ancestry, the juvenile court properly found that ICWA did not apply. Alternatively, DCFS contends that any failure to contact extended family members was harmless error because the parents' statements were sufficiently reliable to support the juvenile court's ICWA finding.

6

# I. Relevant law.

Congress passed ICWA in 1978 " 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . . .' [Citation.]" (*In re Isaiah W.* (2016) 1 Cal.5th 1, 8 (*Isaiah W.*); see 25 U.S.C. § 1902.)

California adopted conforming legislation in 2006 (Sen. Bill No. 678 (2005–2006 Reg. Sess.)), which was amended effective January 1, 2019 (Assem. Bill No. 3176 (2017–2018 Reg. Sess.)). As currently written, the law provides that the court and county welfare department have an affirmative and continuing duty to inquire whether a child for whom a petition may be filed is or may be an "Indian child" (§ 224.2, subd. (a))—that is, an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe" (25 U.S.C. § 1903(4); § 224.1, subd. (a) [adopting federal definition]).

The state law duty to make an ICWA inquiry "begins with the initial contact, including, but not limited to, asking the party reporting child abuse or neglect whether the party has any information that the child may be an Indian child." (§ 224.2, subd. (a).) If a child is removed from parental custody, the county welfare department "has a duty to inquire whether that child is an Indian child. Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and

7

the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or Indian custodian is domiciled."  (§ 224.2, subd. (b).)  Further, at the first appearance in court of each party, "the court shall ask each participant present in the hearing whether the participant knows or has reason to know that the child is an Indian child" and "shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child."  (§ 224.2, subd. (c).)

If the initial inquiry provides "reason to believe" that an Indian child is involved in a proceeding—that is, if the court or social worker "has information suggesting that either the parent of the child or the child is a member or may be eligible for membership in an Indian tribe"—then the court or social worker "shall make further inquiry" regarding the child's possible Indian status as soon as practicable.  (§ 224.2, subd. (e).) Further inquiry "includes, but is not limited to, all of the following:  (A) Interviewing the parents, Indian custodian, and extended family members . . . .  (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services . . . . [and] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility."  (*Ibid*.)

If there is "reason to know" a child is an Indian child, the agency shall provide notice to the relevant tribes and agencies in accordance with section 224.3, subdivision (a)(5).  (§ 224.2, subd. (f).)  There is "reason to know" a child is an Indian child if any one of six statutory criteria is met—i.e., if the court is advised that the child "is an Indian child," the child's or parent's residence is on a reservation, the child is or has been a ward of a

8

tribal court, or either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe. (§ 224.2, subd. (d).)

If the juvenile court finds that "proper and adequate further inquiry and due diligence as required in this section have been conducted and there is no reason to know whether the child is an Indian child," the court may make a finding that ICWA does not apply to the proceedings, "subject to reversal based on sufficiency of the evidence." (§ 224.2, subd. (i)(2).)

## II.    The automatic reversal approach to asserted ICWA errors.

Appellate courts have struggled with how to review a parent's appellate claim that a juvenile court and child welfare agency failed to adequately investigate whether ICWA may apply. Until recently, Courts of Appeal routinely rejected claims of ICWA error where there was no evidence in the juvenile court record that a child was an Indian child and a parent did not affirmatively assert Indian ancestry on appeal. (See, e.g., *In re Charles W.* (2021) 66 Cal.App.5th 483, 490–492 [juvenile court made an adequate ICWA inquiry where ICWA had been found not to apply in earlier case, and mother's counsel, in mother's presence, denied that mother had Indian ancestry]; *In re Austin J.* (2020) 47 Cal.App.5th 870, 887–888 [no duty to make an additional inquiry regarding children's possible Indian ancestry through father where father's in-court statement and his parental notification of Indian status declaration indicated that he had no Indian ancestry]; *In re J.L.* (2017) 10 Cal.App.5th 913, 922–923 [no ICWA inquiry error where mother indicated on an ICWA-020 form that she was not sure whether she had Indian ancestry and did not know which relatives might have such

9

ancestry]; *In re Esmeralda S.* (2008) 165 Cal.App.4th 84, 95 [mother did not demonstrate reversible error where she "is not asserting [on appeal] that she does have American Indian ancestry"]; *In re N.E.* (2008) 160 Cal.App.4th 766, 771 [father did not demonstrate reversible error where he "has not suggested he in fact has any Indian heritage"]; *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1431 [failure to inquire whether father had Indian ancestry was not reversible error where father "is here, now, before this court" but did not represent that he had Indian ancestry].)

Recently, however, some appellate courts have reversed orders terminating parental rights on the mere showing that relatives identified in the juvenile court record were not asked about the family's possible Indian ancestry. The analyses of these courts generally are as follows. First, because the facts of an ICWA inquiry—*who* was asked about the family's Indian ancestry and *what* answers they gave—typically is undisputed, appellate courts may review ICWA inquiry claims de novo. (E.g., *In re I.F.* (2022) 77 Cal.App.5th 152, 163 ["Where the facts are undisputed, we independently review whether ICWA's requirements have been satisfied"]; *In re D.F.* (2020) 55 Cal.App.5th 558, 565 [same].) Second, current California law requires that a broad ICWA inquiry be made of a child's extended family members, and the failure to do so is error as a matter of law. (E.g., *In re J.C.* (2022) 77 Cal.App.5th 70, 79 [Department's failure to make ICWA inquiry of certain extended relatives "violated the express mandate of section 224.2, subdivision (b)"]; *In re Antonio R.* (2022) 76 Cal.App.5th 421, 431 [Department's position "ignores the express obligation that section 224.2, subdivision (b), imposes on the Department to inquire of a child's

10

extended family members"].)  Third, because ICWA is intended to protect the interests of tribes, not of parents, a parent's failure to raise ICWA error in the juvenile court should not forfeit the error on appeal.  (E.g., *In re A.R.* (2022) 77 Cal.App.5th 197, 204 [parent may raise ICWA error for the first time on appeal because " '[t]he parent is in effect acting as a surrogate for the tribe in raising compliance issues on appeal' "]; *In re K.R.* (2018) 20 Cal.App.5th 701, 708 [same].)  Finally, because an agency's failure to make an ICWA inquiry of particular individuals means that the information those individuals might have provided is absent from the juvenile court record, the appealing parent need not demonstrate that any ICWA error was prejudicial.  (E.g., *In re J.C.*, *supra*, 77 Cal.App.5th at p. 80 ["where, as here, the Department's failure to conduct an adequate inquiry makes it impossible for the parent to show prejudice, we must remand for a proper inquiry"]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 556 ["It is unreasonable to require a parent to make an affirmative representation of Indian ancestry where the Department's failure to conduct an adequate inquiry deprived the parent of the very knowledge needed to make such a claim."].)  Applying these analyses, some courts have begun to independently review compliance with statutory ICWA inquiry requirements and to reverse, without any showing of prejudice, if they conclude an agency's inquiry was deficient.

In just the last 12 months, this approach to asserted ICWA error has resulted in, by our count, appellate courts returning more than 100 dependency cases to the juvenile courts with directions to conduct further ICWA inquiries *after* parental rights were terminated.  At best, these reversals significantly delay entry of final judgments releasing children for adoption; at worst,

11

they may result in potential adoptive parents deciding not to adopt.  (See *In re H.V.*, *supra*, 75 Cal.App.5th at p. 442 & fn. 5 (Baker, J., dissenting) [noting that ICWA reversals in appeals from orders terminating parental rights "may throw an adoption off track entirely"].)

There is no real dispute that delays in finalizing adoptions or other permanent placements for children who cannot safely be returned to their parents do not serve the best interests of the children whom the dependency system is intended to protect. (See, e.g., Cal. Rules of Court, rule 5.550 [in considering a child's interests, "substantial weight [must be given] to a child's needs for stability and prompt resolution of custody status, and the damage of prolonged temporary placements"]; *In re Marilyn H.* (1993) 5 Cal.4th 295, 310 [four months "may not seem a long period of time to an adult, [but] it can be a lifetime to a young child"]; *Adoption of A.B.* (2016) 2 Cal.App.5th 912, 924 ["childhood is brief; it does not wait while a parent rehabilitates himself or herself.  The nurturing required must be given by someone, at the time the child needs it"].)  But while courts that apply a rule of "automatic reversal" (see *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777) acknowledge that remands for further ICWA inquiry delay permanence for children, they reason that the reversals are compelled by the statutory language and are necessary to protect the interests of Indian families and communities as ICWA intended.  (E.g., *In re A.C.* (2022) 75 Cal.App.5th 1009, 1016 ["We do not quarrel with the policy arguments the dissent so elegantly elucidates," but such arguments "are grist for the legislative mill."].)

We do not agree that a rule of automatic reversal is compelled by the statutory language.  While section 224.2

12

describes the persons of whom an ICWA inquiry should be made, nothing in its express language requires or permits appellate courts to independently review a juvenile court's ICWA findings. To the contrary, the statute provides that a juvenile court's ICWA findings should be reviewed for "sufficiency of the evidence." (§ 224.2, subd. (i)(2).)  And, nothing in the statute's language suggests that ICWA error requires reversal in the absence of a showing of prejudice.

Nor does automatic reversal protect Indian families and communities whose interests are at the heart of ICWA.  Indeed, we believe the opposite is true.  All of ICWA's substantive and procedural safeguards—including establishing exclusive jurisdiction in the tribal courts for proceedings concerning some Indian children, requiring agencies to make "active efforts" to "prevent the breakup of the Indian family," and placement preferences that favor placing Indian children with members of their extended families (25 U.S.C. §§ 1911, 1912(d), 1915(a))—require that an adequate ICWA inquiry is done at the earliest possible stage of a proceeding, ideally before a petition is filed and children are removed from their parents.  (See, e.g., 25 C.F.R. §§ 23.107 [state courts must make ICWA inquiry "at the commencement of the proceeding"], 23.120 [court must make active efforts "[p]rior to ordering an involuntary foster-care placement"], 23.129 [placement preferences apply in any foster-care, preadoptive, or adoptive placement].)  As the Bureau of Indian Affairs has explained:  "It is . . . critically important that there be an inquiry into that threshold issue *as soon as possible*. If this inquiry is not timely, a child–custody proceeding may not comply with ICWA and thus may deny IWCA protections to Indian children and their families."  (Indian Child Welfare Act

13

Proceedings, 81 Fed.Reg. 38778, 38802 (June 14, 2016) (BIA ICWA Proceedings), italics added.) Consistent with these federal requirements, California law requires child protective agencies to make ICWA inquiries before filing juvenile dependency petitions, and requires juvenile courts to make ICWA inquiries at each parent's first appearance. (§ 224.2, subd. (c); Cal. Rules of Court, rule 5.481(a)(1), (2).)

Because early identification of Indian children is critical to ICWA's proper implementation, we believe the statute must be interpreted in a way that requires *all* participants—child protective agencies, the parents, all counsel, and the juvenile courts—to work together to determine whether children are Indian children. The child protective agencies and the juvenile courts unquestionably have a key role to play in this determination: As many cases have noted, juvenile courts and child protective agencies "have 'an affirmative and continuing duty to inquire' whether a dependent child is or may be an Indian child." (E.g., *In re Michael V.* (2016) 3 Cal.App.5th 225, 233.) But this does not mean that other participants have no ICWA obligations. To the contrary, parents are required at their first appearances to fill out ICWA-020 forms in which they declare their Indian status under penalty of perjury, and they are instructed that if they get new information, they must "let [their] attorney, all the attorneys on the case, and the social worker . . . know immediately." (Judicial Council of Cal., Form ICWA-020 [rev. Mar. 25, 2020]; see also § 224.2, subd. (c) [at each party's first appearance, the court shall ask whether the child is an Indian child, and shall instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child]; 25 C.F.R. § 23.107(a) [same].)

14

Further, a Los Angeles County local court rule requires attorneys appointed to represent parents in child dependency cases to "affirmatively inquire of their client as to whether he or she has reason to believe that any child appearing in the dependency court has Indian heritage under the ICWA" and to make "[e]very effort . . . to assist confirmation of a child's Indian status and tribal membership." (Super. Ct. L.A. County, Local Rules, rule 7.17(a); see also *id.*, rule 7.17(e)(3) [at the parent's first appearance, his or her attorney should inquire as to the applicability of ICWA and so inform the court].) Parents' counsel are also required to have "a complete familiarity with the facts of the case by reviewing the court file," bring appropriate motions, and otherwise conduct an independent investigation. (*Id.*, rule 7.17(e)(5).)

Federal, state, and local law thus recognize that requiring all parties to actively participate in the ICWA inquiry is critical to ensuring that an adequate ICWA investigation is conducted and Indian children are promptly identified at the earliest possible stages of dependency cases. Permitting parents to raise ICWA inquiry errors for the first time in an appeal from an order terminating parental rights has precisely the opposite effect, discouraging parents' counsel from bringing ICWA inquiry errors to the juvenile court's attention and rewarding parents who fail to cooperate with an agency's ICWA inquiry—in essence, allowing parents to use ICWA as "a 'get out of jail free' card dealt to parents of non-Indian children, allowing them to avoid a termination order by withholding secret knowledge, keeping an extra ace up their sleeves." (*In re H.B.* (2008) 161 Cal.App.4th 115, 122.)

15

For all of these reasons, we believe an automatic reversal approach to claims of ICWA inquiry errors is not compelled by the statute, harms the interests of dependent children, and is not in the best interests of Indian communities. We therefore decline to apply it. Instead, as we discuss in the next sections, we believe the statutory language is most faithfully applied, and the interests of children and Indian communities best protected, by reviewing claims of ICWA error under a hybrid substantial evidence/abuse of discretion standard, and reversing only if an appellant demonstrates that an ICWA error was prejudicial.

### III. In an appeal from an order terminating parental rights, appellate courts should review asserted ICWA inquiry errors under a hybrid substantial evidence/abuse of discretion standard, and should reverse only if ICWA error was prejudicial.

#### A. The substantial evidence/abuse of discretion standard.

There are two statutory predicates to a juvenile court's finding that ICWA does not apply. First, the court must determine whether there is "reason to know" whether the child is an Indian child. (§ 224.2, subd. (i)(2).) Second, the court must decide whether a "proper and adequate further inquiry and due diligence as required in this section have been conducted." (*Ibid.*) If the court finds an adequate inquiry has been conducted and there is no reason to know a child is an Indian child, "the court may make a finding that the federal Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.) does not apply to the proceedings." (*Ibid.*)

16

The first element—whether there is reason to know whether the child is an Indian child—requires the juvenile court to determine, based on the evidence before it, whether any one of six statutory criteria is met—e.g., (1) the court has been advised that the child "is an Indian child," (2) the child's or parent's residence is on a reservation, (3) any participant in the proceeding informs the court that it has discovered information indicating the child is an Indian child, (4) the child gives the court reason to know that he or she is an Indian child, (5) the child is or has been a ward of a tribal court, or (6) either parent or the child possess an identification card indicating membership or citizenship in an Indian tribe.  (§ 224.2, subd. (d).)  If none of these six factors is met, the court must make a finding that there is no reason to know the child is an Indian child.

This determination is fundamentally a factual determination, and so we believe it should be reviewed for substantial evidence.  (*In re Caden C*. (2021) 11 Cal.5th 614, 639–640 (*Caden C*.) [factual determinations reviewed for substantial evidence].)  In other words, we "should 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts,' " but should uphold the lower court's determinations " 'if . . . supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence.' "  (*Id*. at p. 640.)

The second element—whether a "proper and adequate further inquiry and due diligence as required in this section have been conducted" (§ 224.2, subd. (i)(2))—is somewhat different.  Deciding whether an inquiry was "adequate" and an agency acted with appropriate diligence requires more of a court than simply

17

applying a statutory checklist to undisputed facts. Instead, it requires the court to "engage in a delicate balancing" (*Caden C.*, *supra*, 11 Cal.5th at p. 640), to assess whether an ICWA inquiry was appropriate and sufficient in light of the facts of a particular case. In short, the statute directs the juvenile court to perform a quintessentially discretionary function, and thus we believe our review should be for abuse of discretion. (E.g., *People v. Jurado* (2006) 38 Cal.4th 72, 136 [whether prosecution provided defendant "timely and adequate" notice that it would pursue the death penalty reviewed for abuse of discretion]; *People v. Wilson* (2005) 36 Cal.4th 309, 352 [trial court's finding that defendant did not exercise due diligence to secure witness's attendance at trial reviewed for abuse of discretion]; *Carter v. City of Los Angeles* (2014) 224 Cal.App.4th 808, 819 [whether class notice was adequate was subject to abuse of discretion review]; *People v. Shane* (2004) 115 Cal.App.4th 196, 203 [applying an abuse of discretion standard of review to trial court's due diligence determination].)

The need for a juvenile court to exercise discretion in considering whether an ICWA inquiry is adequate is particularly acute because the scope of the inquiry required by state law is not well defined. As noted above, section 224.2, subdivision (b) requires the county welfare department to "inquire whether [a dependent child] is an Indian child," and it says that inquiry "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child . . . ." (§ 224.2, subd. (b).) An "extended family member" is (unless otherwise defined by an Indian child's tribe) an adult who

18

is "the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin or stepparent." (25 U.S.C. § 1903(2); § 224.1, subd. (c) [adopting federal definition].)

Because the persons identified in section 224.2, subdivision (b) are connected by the word "and," not "or," and because "extended family member" is broadly defined, the statute facially requires that, *in every case*, initial inquiry be made of *at least* all of the following: (1) the child, (2) the parents, (3) the legal guardian (presuming there is one, although the statute doesn't say that explicitly), (4) the Indian custodian (again presuming there is one, although again the statute doesn't say that), (5) all grandparents, (6) all aunts and uncles, (7) all adult siblings, (8) all siblings-in-law, (9) all nieces and nephews, (10) all first cousins, (11) all second cousins, (12) the reporting party, and (13) all others who have an interest in the child. The statute then requires that if the initial inquiry gives rise to reason to believe a child is an Indian child, a *further* inquiry shall be made that "includes, but is not limited to" interviewing the parents, Indian custodian, and extended family members (§ 224.2, subd. (e)(2)(A))—that is, all the same individuals the statute says should be interviewed as part of the initial inquiry.

Plainly, complying with the literal language of the statute—that is, making an *initial* and *further* ICWA inquiry of every member of a child's extended family, including first and second cousins, plus every other person who has an interest in the child—is absurd at best and impossible at worst. In some cases, parents refuse to provide DCFS with any relative information, making contact with extended family impossible. In other cases, parents provide DCFS with partial information—a

19

relative's name and the city where they were last known to have lived, for example, or a phone number that is no longer in service—making it extremely difficult for DCFS to contact the relative, if it is able to do so at all. And in yet other cases, a parent's extended family is so large that contacting every person identified in the statute would be neither practical nor useful.

In short, given the statute's expansive language and the vagaries of the extended family information parents are willing or able to provide, determining compliance with ICWA requires a significant exercise of discretion. Consider the following scenarios (all of which are based on appeals recently before us):

—Father denies any Indian ancestry when interviewed by a social worker and at his first court appearance. He was removed from his own parents as a young child and raised by his paternal uncle and aunt. His paternal uncle has died, and he does not speak to his paternal aunt or either parent. He has six full brothers and sisters, five maternal half-siblings, and six or seven paternal half-siblings.

—Mother believes she may have Indian ancestry through her father's grandmother, but she has not been in contact with her father for many years and does not know if her great-grandmother is still alive. She provides her father's first and last name, both of which are very common, but she does not know her father's phone number, address, or date of birth. She tells DCFS that last she knew, her father was living in Los Angeles.

—Father denies Indian ancestry when interviewed by a social worker and in court. He provides a social worker with the name of his mother and stepmother, but he does not have their contact information. He says he will ask them to call DCFS; they do not. He also gives the social worker the name and a phone

number for his grandmother, but the phone number is no longer in service. The social worker contacts father again to try to get additional contact information for his parents and grandmother, but father does not return the call.

None of these scenarios lends itself to a mechanical application of the statute. While the statute requires the social services agency to act with "due diligence," it does not describe what diligence is required where a parent identifies extended family members but does not provide their accurate contact information. Nor does the statute specify how many extended family members the agency must interview. As a result, a child welfare agency "has no way to reliably know when to say when— i.e., to predict how many interviews of extended family members and others will be enough to satisfy a court that it has discharged its continuing duty to investigate whether a minor could be an Indian child." (*In re H.V.*, *supra*, 75 Cal.App.5th at pp. 440–441 [Baker, J., dissenting].)

Some courts that independently review asserted ICWA error dodge this troubling issue by limiting their analyses of the adequacy of an ICWA inquiry to those relatives identified by the parent on appeal. (E.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 430 & fn. 6.) Our dissenting colleague does the same, suggesting that all we need consider in this case is whether DCFS should have inquired of the three extended family members mother identifies on appeal—not of the seven others whose names and contact information appear in the record but whom mother inexplicably does not address. (Dissent, p. 7 ["The issue before us isn't whether the statute would, in a hypothetical case, require a child protective agency to track down and interview an overwhelming number of relatives. That issue

21

should be addressed in the future when, if ever, it's raised on appeal."].)  But that approach wields appellate procedure to avoid the difficult question of precisely *who* DCFS was required to ask about the family's ancestry—and it requires significantly less of the appellate courts than it does of the juvenile courts, limiting our own appellate inquiry to those issues (and persons) appellate counsel identify, while presumably requiring the juvenile courts deciding the adequacy of an ICWA inquiry to scour the record for references to any extended family members of whom DCFS may not have made an ICWA inquiry.  Further, this approach provides no useful guidance to the child welfare agencies, who are tasked with conducting complete and accurate ICWA inquiries in the first instance.  And, it creates a likelihood of successive appeals, all raising purported ICWA errors based on the same record.

The difficulty of describing precisely what the statute requires in a particular case is highlighted by the ambiguity of the remand instructions in cases that independently review alleged ICWA error.  Although the reversals in these cases are based on an agency's failure to make an ICWA inquiry of particular named individuals, the remand instructions typically are not limited to these individuals, but instead send cases back to juvenile courts with instructions to ensure ICWA compliance, without specifying exactly what that entails.  (See, e.g., *In re J.C.*, *supra*, 77 Cal.App.5th at p. 84 [conditionally affirming "with directions to ensure the Department fully complies with the inquiry and, if necessary, notice provisions of ICWA and related California law, including interviewing Cheryl, Kathryn, and any other extended family members they may identify"]; *In re Antonio R.*, *supra*, 76 Cal.App.5th at pp. 436–437 [conditionally

22

affirming with directions "for the Department and the court to comply with the inquiry and notice provisions of ICWA and California law consistent with this opinion, including inquiring of the maternal extended family members"]; *In re H.V.*, *supra*, 75 Cal.App.5th at pp. 438–439 [conditionally affirming with directions to the juvenile court "to order the Department to comply with ICWA," including by "conduct[ing] an inquiry investigation into the child's Indian ancestry, including making diligent efforts to interview the child's extended family members . . . including at least mother, maternal great-grandmother, C.W., and maternal great-grandfather"].)

What drives these ambiguous remand instructions is the difficulty of applying the statutory inquiry requirements to the facts of a particular case. Until inquiry is made of an extended family member, a court can't know whether that individual will provide names of other knowledgeable family members, thus making further inquiry possible. Similarly, the court can't know what difficulties an agency may face on remand if, for example, one of the individuals whom the agency was directed to interview has moved, changed his or her phone number, or died. These are real concerns, and ones we believe highlight the need to review the adequacy of an agency's ICWA inquiry for abuse of discretion, leaving it to *the juvenile court*, not this court, to decide whether an agency has done enough.

### B. Applying the abuse of discretion standard in the ICWA inquiry context.

#### 1. Reliability of the ICWA information provided.

"Review for abuse of discretion is . . . focused not primarily on the evidence but the application of a legal standard. A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' ([*In re Stephanie M.* (1994)] 7 Cal.4th [295,] 318.) But ' " '[w]hen two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' " ' (*Id.* at p. 319; see also [*In re Robert L.* (1993)] 21 Cal.App.4th [1057], 1067 ['The reviewing court should interfere only " 'if . . . under all the evidence, viewed most favorably in support of the trial court's action, no judge could reasonably have made the order that he [or she] did' " '].)" (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

In reviewing a juvenile court's ICWA findings for abuse of discretion, we believe the key inquiry should be whether the ICWA inquiry conducted has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding "is or may be an Indian child" (§ 224.2, subd. (a))— that is, whether he or she is either (a) "a member of an Indian tribe" or (b) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also § 224.1, subds. (a)–(b); BIA ICWA Proceedings, *supra*, 81 Fed.Reg. at p. 38795 ["The statute specifies that if the child is not a Tribal member, then the child must be a biological child of a member and be eligible for membership, in order for the

child to be an 'Indian child.' "].) In other words, the focus of the court's analysis should not be on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation.

In evaluating this question, it is important to note that "ICWA does not apply simply based on a child or parent's Indian ancestry." (U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) (BIA Guidelines), p. 10 <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2 -056831.pdf> [as of July 28, 2022], archived at <https://perma.cc/5758-64CA>.) Instead, the "definition of "Indian child" is "based on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship." (BIA ICWA Proceedings, *supra*, 81 Fed.Reg. at p. 38795, italics added.)[4] In other words, an Indian child is one with a tribal affiliation, not merely Indian ancestry.

Tribal membership criteria are set forth in tribal constitutions, articles of incorporation, or ordinances, and vary from tribe to tribe. (U.S. Dept. of Interior, A Guide to Tracing American Indian & Alaska Native Ancestry, p. 4 <https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc-002619.pdf> [as of July 28, 2022], archived at

---

[4] The terms "citizen" and "citizenship" are synonymous with "member" and "membership" in the context of Tribal government. (BIA ICWA Proceedings, *supra*, 81 Fed.Reg. at p. 38795.)

https://perma.cc/JN6Y-74G9.) Significantly, "Tribal citizenship (aka Tribal membership) is voluntary and typically requires *an affirmative act* by the enrollee or her parent." (BIA ICWA Proceedings, 81 Fed. Reg. at p. 38783, italics added.) Specifically, "Tribal laws generally include provisions requiring the parent or legal guardian of a minor *to apply* for Tribal citizenship on behalf of the child. [Citation.] Tribes also often require *an affirmative act* by the individual seeking to become a Tribal citizen, such as the filing of an application. [Citation.] As ICWA is limited to children who are either enrolled in a Tribe or are eligible for enrollment and have a parent who is an enrolled member, *that status inherently demonstrates an ongoing Tribal affiliation*." (*Ibid.*, italics added; see also BIA Guidelines, *supra*, at p. 10 ["Most Tribes require that individuals apply for citizenship and demonstrate how they meet that Tribe's membership criteria."].)[5]

---

[5] See also, for example, Cheyenne and Arapaho Tribes, Requirements for Tribal Enrollment <https://cheyenneandarapaho-nsn.gov/elder-services/elder-language-culture-and-education-services/requirements-for-tribal-enrollment/> (as of July 28, 2022), archived at https://perma.cc/C8RG-E9EZ [requiring membership application to be submitted with required documentation attached, to be reviewed by Enrollment Committee]; Hopi Tribe, Application for Hopi Membership <https://www.hopi-nsn.gov/wp-content/uploads/2021/12/Application-for-Hopi-Membership-.pdf> (as of July 28, 2022), archived at https://perma.cc/42Q2-NWF3 [requiring submission of Application for Hopi Membership and certified copies of applicant's birth certificate and social security card, after which the Hopi Enrollment Office determines whether membership criteria have been met and refers the request for membership to the Hopi Tribal Council for approval]; Pascua

Because tribal membership typically requires an affirmative act by the enrollee or her parent, a child's parents will, in many cases, be a reliable source for determining whether the child or parent may be a tribal member. We therefore believe a juvenile court may find an ICWA inquiry was adequate even if an agency has not interviewed some available family members.[6]

The dissent suggests that a parent is not a reliable source of membership information because only a tribe may determine whether a child or his or her parent is a member. (Dissent, pp. 7–8.) We do not dispute the latter assertion, but we disagree wholeheartedly with the former. The tribe undoubtedly sets its own membership criteria and is the keeper of membership records, and thus its determination "that a child is or is not a member of, or eligible for membership in, that tribe . . . shall be conclusive." (§ 224.2, subd. (h).) But a parent typically will know whether she has applied for membership for herself or her child— and her disclosure that she has not will, in most cases, reliably establish that a child is not an Indian child within the meaning of ICWA.

For the same reason, we disagree with the suggestion made in some recent appellate decisions that a parent may not have

Yaqui Tribe, Membership Criteria and Requirements <https://www.pascuayaqui-nsn.gov/enrollment/membership-criteria-and-requirements/> (as of July 28, 2022), archived at https://perma.cc/ST6W-U8XP [membership in the Pascua Yaqui Tribe requires, among other things, that an individual "[a]pplies for and is granted membership under the laws of the Pascua Yaqui Tribe and consistent with this section"].

[6]     Of course, we leave it to the juvenile court to determine whether an inquiry is adequate in a particular case.

reliable information about tribal membership because "over time, Indian families, particularly those living in major urban centers like Los Angeles, may well have lost the ability to convey accurate information regarding their tribal status." (See, e.g. *In re T.G.* (2020) 58 Cal.App.5th 275, 295.) It is indisputable that federal policies that forced or encouraged Indians to leave their traditional lands and assimilate into the general population had the tragic effect of separating many Indian families from their communities, resulting in many families now being unaware of their Indian ancestry. (See *id.* at p. 295 & fn. 19.) But as we have said, ICWA does not apply based merely on a child or parent's Indian ancestry—there must be a *political relationship* to a tribe. Because such relationship requires an affirmative act by an individual or her parent, we believe it will be rare that a parent is unaware of her own or her child's tribal membership.

The dissent also suggests that the statute should be interpreted with reference to the California ICWA Compliance Task Force Report (Report), which the dissent says was the catalyst for the Legislature's 2018 amendments to sections 224.2 and 224.3. (Dissent, p. 10.) Our review of the reports prepared for members of the Legislature in connection with Assembly Bill 3176, however, does not reveal a single reference to the Report or its recommendations. (See Assem. Com. on Human Services, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as introduced Apr. 2, 2018; Assem. Com. on Judiciary, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Apr. 11, 2018; Assem. Com. on Appropriations, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Apr. 11, 2018; Assem. Off. of Research, 3d reading analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) May 25, 2018; Sen. Com. on

Judiciary, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended June 18, 2018; Sen. Com. on Appropriations, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended June 18, 2018; Sen. Com. on Appropriations, Analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 16, 2018; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 17, 2018; Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 22, 2018; Conc. in Sen. Amends., Assem. Bill No. 3176 (2017–2018 Reg. Sess.) as amended Aug. 22, 2018.)  Indeed, the California Health and Human Services Agency enrolled bill report to which the dissent cites was prepared not for the Legislature, but for the Governor, and is part of the Governor's Chaptered Bill File.  While the Report thus may have been part of the impetus for introduction of Assembly Bill 3176, we are not aware of evidence suggesting that the Report was before the Legislature or reflects its intent.  (See *Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1218, fn. 3 [enrolled bill reports prepared for the Governor, "do not take precedence over more direct windows into legislative intent such as committee analyses, and cannot be used to alter the substance of legislation," although they may be " 'instructive' in filling out the picture of the Legislature's purpose"]; *People v. Allen* (2001) 88 Cal.App.4th 986, 995, fn. 19 [enrolled bill reports prepared by the executive branch for the Governor "do not necessarily demonstrate the Legislature's intent," although they can "*corroborate* the Legislature's intent, as reflected in legislative reports"]; *K.C. v. Superior Court* (2018) 24 Cal.App.5th 1001, 1008, fn. 2 [same].)

29

For the foregoing reasons, we believe inquiry of the parents will, in many cases, yield reliable information about a child's possible tribal affiliation. In other cases, inquiry of extended family members will be necessary, either because parents do not appear in the dependency proceedings, refuse to answer ICWA inquiries, or give answers that are deemed unreliable by the juvenile court. Whether an ICWA inquiry is sufficient in a particular case is a matter we leave to the sound discretion of the juvenile court, to be exercised in light of the statutory requirements and the facts of the case.

## 2. Whether an objection was made below to the adequacy of an ICWA inquiry.

In the context of an appeal from an order terminating parental rights, we believe the abuse of discretion standard must also consider whether an objection was made below to the adequacy of an ICWA inquiry. As we have discussed, ICWA works as intended only if Indian children are identified at the earliest possible stages of a dependency proceeding. This unquestionably requires child protective agencies to conduct thorough ICWA inquiries prior to filing petitions or removing children from their parents' custody, as well as to continue to explore possible tribal connections as new information becomes available. But we believe it also requires all counsel to critically review the agency's ICWA inquiry at every stage of the proceedings and to alert the juvenile court if an inquiry is inadequate.

Consider the present case. Based on the parents' representations to DCFS and the court, the juvenile court found that ICWA did not apply in February 2018. Subsequent to that finding, DCFS filed reports every six months that revealed the

30

agency had contact with many members of the extended family but so far as we know did not make an ICWA inquiry of those individuals. Had the parents' counsel objected to the ICWA inquiry based on these reports, the juvenile court could have decided whether to order a further inquiry, taking into account the relationship of the identified individuals to the children, the extent of DCFS's prior inquiry, and the adequacy of the contact information provided. The court also could have monitored DCFS's compliance with its order and ordered further inquiry as appropriate. Significantly, moreover, it could have done so without delaying permanency for these children.

If juvenile courts are to ensure that ICWA inquiries are complete and accurate, they must be able to rely on counsel to review the agency's reports and bring to the court's attention if the agency has not done enough. While juvenile courts have the ultimate responsibility to order ICWA compliance, we cannot reasonably expect them to scour agency records—which may be hundreds or thousands of pages long—to search for names of relatives of whom an ICWA inquiry could have been but was not made. That should be the responsibility of counsel. (See *In re A.C.*, *supra*, 75 Cal.App.5th at pp. 1022–1023 (dis. opn. of Crandall, J. [parents' and children's counsel "should be expected to fully and timely participate in the ongoing ICWA inquiry"].) And if counsel do not identify any ICWA errors below, that fact should be a relevant consideration in evaluating whether a juvenile court abused its discretion in finding that an ICWA inquiry was sufficient.

We cannot conclude this analysis without addressing the Supreme Court's decision in *Isaiah W.*, *supra*, 1 Cal.5th at page 9. There, the court considered whether a parent who failed

31

to appeal from the juvenile court's dispositional order, which included a finding that ICWA notice was unnecessary, could raise the ICWA notice issue on appeal from an order terminating parental rights. (*Id*. at p. 6.) The court held that because ICWA imposes on the juvenile court a continuing duty to inquire whether the child is an Indian child, a parent may challenge a finding of ICWA's inapplicability in an appeal from the subsequent order, even if she did not raise such a challenge in an appeal from the initial order. (*Ibid*.)

Our conclusion that counsel's failure to object to the adequacy of an ICWA inquiry is relevant to the juvenile court's asserted abuse of discretion is not inconsistent with *Isaiah W.* The issue in *Isaiah W.* was whether an appellate court could examine the ICWA issue *at all* if an ICWA finding had been made at an earlier hearing from which no appeal had been taken. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9 ["The issue presented here is whether [mother]—having brought no timely challenge to the January 2012 foster care placement order, which subsumed a finding by the juvenile court that ICWA notice was unnecessary—may now challenge the April 2013 order terminating her parental rights on the ground that the juvenile court erred in finding ICWA notice unnecessary."].) *Isaiah W.* thus had no occasion to consider—and did not consider—the standard by which purported ICWA errors should be reviewed or whether a parent's failure to object to such errors below was relevant to that analysis. Nor did the court consider whether a failure to object to an ICWA finding may be a *relevant* factor— albeit not the *conclusive* factor—in evaluating abuse of discretion.

32

As our Supreme Court has recognized in another context, encouraging parties to raise errors for the first time on appeal is not sound policy because it denies trial courts the opportunity to correct such errors and delays final resolution of litigated matters. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138.) In the present context, it permits parents to raise ICWA error for the first time in an appeal from an order terminating parental rights, thus significantly delaying permanency for their children—and then to remain silent if further ICWA errors occur on remand, and appeal again. Such an approach is "clearly unproductive" in any context (*ibid.*), and is especially problematic here, where the rights of dependent children and Indian communities are at issue.

## C. Prejudicial error.

Finally, as our colleagues in Division Two have recently suggested, we believe that where an appeal is taken from an order terminating parental rights, ICWA inquiry error should require reversal only if prejudicial—that is, if "the record contains information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA, such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*In re Dezi C.*, *supra*, 79 Cal.App.5th at p. 779.) As Division Two has explained, this test is "outcome focused," asking whether "it is reasonably probable that an agency's error in not conducting a proper initial inquiry affected the correctness (that is, the *outcome*) of the juvenile court's ICWA finding," and limiting a remand for further inquiry "to those cases in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding." (*Id*. at pp. 781–782, italics added.)

33

## IV. Application of these standards to the present case.

With these standards in mind, we turn to the facts of the present case. Here, mother and both fathers told the court that their families did not have Indian ancestry, and mother and Randy signed ICWA-020 forms attesting that, to their knowledge, they had no Indian ancestry. No contrary evidence appeared in the record. We therefore conclude that the juvenile court's finding that there was no reason to know the children are Indian children was supported by substantial evidence.

We further conclude that the juvenile court did not abuse its discretion by finding that DCFS made a proper and adequate inquiry and acted with due diligence. Each of the parents unequivocally denied Indian ancestry, and mother has not identified any evidence in the record that would support an inference that she or the children's fathers might unknowingly be members of an Indian tribe. Indeed, the evidence is to the contrary: All of the parents appear to have been in contact with their extended families, and thus the possibility that they might unknowingly be members of a tribe appears trivially small. (Compare *In re Y.W.* (2021) 70 Cal.App.5th 542, 548 [mother was adopted and did not have information about her biological relatives]; *In re Benjamin M.*, *supra*, 70 Cal.App.5th at pp. 740, 745 [father never appeared and mother had no reason to know father's ancestry]; *In re A.C.*, *supra*, 75 Cal.App.5th at p. 1017 ["mother, as a foster care product, may not know her cultural heritage"].) Further, notwithstanding multiple opportunities to do so, no parent ever objected below to the adequacy of the ICWA inquiry or the juvenile court's conclusion that ICWA did not apply to this case. Accordingly, we find mother has not demonstrated that the juvenile court's ICWA findings were in error.

34

Finally, we conclude that even if the juvenile court erred by finding DCFS's inquiry adequate, that error was not prejudicial. Nothing in the record gives us a reason to doubt the accuracy of the parents' denial that they or their children were members of or eligible for membership in an Indian tribe, and thus it is not reasonably probable that the children are Indian children within the meaning of ICWA.

For all the foregoing reasons, we will affirm the orders terminating parental rights.

## DISPOSITION

The orders terminating parental rights are affirmed.

**CERTIFIED FOR PUBLICATION**

EDMON, P. J.

I concur:

EGERTON, J.

LAVIN, J., Dissenting:

I disagree with the majority's analysis and conclusion. The California statutes and rules of court that implement the Indian Child Welfare Act (ICWA) of 1978 (25 U.S.C. § 1901 et seq.) (ICWA) are clear that a child protective agency must interview a child's extended relatives as part of its initial inquiry, regardless of whether the child's parents affirm or deny knowledge of Indian ancestry. (See Welf. & Inst. Code, § 224.2, subd. (b); Cal. Rules of Court, rule 5.481(a)(1).)[1] And here it is undisputed that the Los Angeles County Department of Children and Family Services (Department) failed to ask the children's identified family members—including maternal uncle M.B., maternal cousin R.P., and paternal aunt K.G.—about the family's possible Indian ancestry.[2] Accordingly, I would conclude that the Department did not fulfill its duty of initial inquiry and substantial evidence did not support the juvenile court's finding that ICWA did not apply. I would also conclude that mother's failure to make affirmative representations about possible Indian heritage does not render the error harmless. Thus, I would conditionally affirm the orders terminating mother's parental rights and remand the matter to the juvenile court for full compliance with the inquiry provisions of ICWA and related California law.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code and all undesignated rule references are to the California Rules of Court.

[2] Although the Department was given contact information for and/or had contact with a variety of extended family members, M.B., R.P., and K.G. are the only relatives mother contends the Department should have interviewed under ICWA.

1

# DISCUSSION

## 1.     ICWA and the Inquiry and Notice Requirements

Congress enacted ICWA to protect Indian children and to promote the stability and security of Indian tribes and families. (25 U.S.C. § 1902.) The law establishes minimum federal standards that a court must follow before removing Indian children from their families. (*Ibid.*; see also *In re T.G.* (2020) 58 Cal.App.5th 275, 287 (*T.G.*).) These standards were enacted to address " 'abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes.' " (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) Congress found that states exercising jurisdiction over Indian child custody proceedings, " ' "have often failed to recognize the essential tribal relations of Indian people and the cultural and social standards prevailing in Indian communities and families." ' " (*In re K.T.* (2022) 76 Cal.App.5th 732, 740 (*K.T.*).)

ICWA and its related federal regulations set a floor for minimal procedural protections for Indian children, their families, and their tribes. (*T.G.*, *supra*, 58 Cal.App.5th at p. 288.) But states are expressly authorized to set "a higher standard of protection to the rights of the parent or Indian custodian of an Indian child than the rights provided under" the federal statute and regulations. (25 U.S.C. § 1921.) Where a state standard is higher than the related federal law, courts must apply the higher state standard. (*Ibid.*)

California has enacted such higher standards. (*T.G.*, *supra*, 58 Cal.App.5th at pp. 289–290.) Our statutes impose on courts and child protective agencies "an affirmative and continuing duty

2

to inquire whether a child [in a dependency proceeding] is or may be an Indian child." (§ 224.2, subd. (a).) The duty to inquire begins at the outset of a child's dependency case and requires the juvenile court and child protective agencies to ask all relevant individuals who are involved with the case whether the child may be an Indian child. (§ 224.2, subd. (c); *T.G.*, at p. 290.) "[T]he burden of coming forward with information to determine whether an Indian child may be involved and [the extent of] ICWA notice required in a dependency proceeding does not rest entirely—or even primarily—on the child and his or her family." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 233.) That is, the burden rests "squarely on the courts and child [protective] agencies." (*In re A.R.* (2022) 77 Cal.App.5th 197, 207 (*A.R.*).)

When a child is placed into temporary custody, the child protective agency has a duty of initial inquiry under section 224.2, subdivision (b), which requires the agency to ask certain individuals related to the child and the proceedings "whether the child is, or may be, an Indian child … ." If the initial inquiry provides the agency or the court "reason to believe that an Indian child is involved in a proceeding," then the agency or the court must conduct a "further inquiry regarding the possible Indian status of the child." (§ 224.2, subd. (e).)

Once there is "reason to know" that an Indian child is involved, formal notice must be sent to the child's parents or legal guardians, Indian custodian, if any, and the child's tribe. (§§ 224.2, subd. (f) & 224.3, subd. (a).) Formal notice requires providing the tribe with, among other things, "extensive biographical data" about a child's relatives, including parents, grandparents, and great-grandparents. (*T.G.*, *supra*, 58 Cal.App.5th at p. 294; see § 224.3, subd. (a)(5)(C).)

3

A juvenile court may conclude ICWA doesn't apply to a child's proceeding if it finds the child protective agency has satisfied its duty of inquiry and there is no reason to know that the child is an Indian child. (§ 224.2, subd. (i)(2); rule 5.481(b)(3)(A).) An ICWA violation " 'renders the dependency proceedings, including an adoption following termination of parental rights, vulnerable to collateral attack if the dependent child is, in fact, an Indian child.' " (*In re E.H.* (2018) 26 Cal.App.5th 1058, 1072 (*E.H.*); see also 25 U.S.C. § 1914.)

## 2. The Department failed to conduct an adequate inquiry into the children's possible Indian ancestry.

This case requires us to interpret section 224.2, subdivision (b) to determine whether a child protective agency must ask, as part of its initial inquiry, extended family members about a child's possible Indian ancestry. Courts independently interpret statutes. (*John v. Superior Court* (2016) 63 Cal.4th 91, 96 (*John*).)

Section 224.2, subdivision (b) provides that once a child is placed into temporary custody, the child protective agency "has a duty to inquire whether the child is an Indian child," which "includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child and where the child, the parents, or the Indian custodian is domiciled." (§ 224.2, subd. (b).) An extended family member under ICWA is an adult who is, unless otherwise defined by the law or custom of the child's tribe, "the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." (25 U.S.C.

4

§ 1903(2); § 224.1, subd. (c) [adopting the federal definition of an extended family member].)

" 'Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.]' " (*John*, *supra*, 63 Cal.4th at pp. 95–96.) If the language is clear, we " 'must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend.' " (*Busker v. Wabtec Corp.* (2021) 11 Cal.5th 1147, 1157.) We should also give meaning to every word in the statute and avoid a construction that makes any word surplusage, unless doing so would defeat the clear statutory purpose. (*Toulumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1039.) And where, as here, remedial legislation is involved, we must interpret the statute broadly. (*In re I.F.* (2022) 77 Cal.App.5th 152, 163 (*I.F.*) [the affirmative and ongoing duty to inquire under California law serves a "remedial purpose" requiring us to broadly construe state ICWA statutes].)

On its face, section 224.2, subdivision (b) requires a child protective agency to ask, as part of its initial inquiry, a family's extended relatives whether a child is or may be an Indian child. In addition to this statutory mandate, rule 5.481(a)(1)—one of the rules adopted by the Judicial Council governing inquiry and notice requirements—provides that when removing a child from his or her parent's custody, the agency "*must ask* the child, if the child is old enough, the parents, Indian custodian, or legal guardians, *extended family members*, others who have an interest in the child, and where applicable the party reporting child abuse

5

or neglect, whether the child is or may be an Indian child." (Italics added.) (See *R.R. v. Superior Court* (2009) 180 Cal.App.4th 185, 205 ["Rules of Court have the force of law and are as binding as procedural statutes as long as they are not inconsistent with statutory or constitutional law."].) Neither section 224.2, subdivision (b) nor rule 5.481(a)(1) condition the requirement to interview extended family members on whether a parent affirms or denies knowledge of possible Indian ancestry.

Because I don't see any ambiguity in section 224.2, subdivision (b)'s language, and the majority doesn't identify any, I would apply section 224.2, subdivision (b)'s plain language to the facts of this case. (*Jarrow Formulas, Inc. v. LaMarche* (2003) 31 Cal.4th 728, 736 [" 'Where, as here, legislative intent is expressed in unambiguous terms, we must treat the statutory language as conclusive.' "].) Indeed, numerous published decisions interpreting section 224.2, subdivision (b) have adopted a similar plain reading of the statute, holding that a child protective agency must interview extended family members as part of the agency's initial inquiry. (See, e.g., *In re Antonio R.* (2022) 76 Cal.App.5th 421, 430 (*Antonio R.*) [even though the parents denied Indian ancestry, it was error for the child protective agency not to ask extended family members about ICWA]; *In re J.C.* (2022) 77 Cal.App.5th 70, 78–80 [same]; *In re A.C.* (2022) 75 Cal.App.5th 1009, 1015 [same]; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509 [same]; *In re H.V.* (2022) 75 Cal.App.5th 433, 438 (*H.V.*) [same]; *In re E.V.* (June 30, 2022, G061025) __ Cal.App.5th __, [pp. 2–6, 8]; *In re Benjamin M.* (2021) 70 Cal.App.5th 735, 742–746 [same]; *In re Y.W.* (2021) 70 Cal.App.5th 542, 552–555 [same].)

Under a plain reading of section 224.2, subdivision (b), the Department did not fulfill its duty to conduct an adequate inquiry into whether Unique, Dominic, and Ezequiel Jr. may be Indian children because it did not ask their identified and readily available family members about possible Indian ancestry. Indeed, as the majority acknowledges, the Department was given contact information for and/or had contact with a variety of extended family members, including M.B., R.P., and K.G. (Maj. opn. *ante*, at p. 6.) The Department's failure to interview these readily available relatives about the children's possible Indian ancestry violated the express mandate of section 224.2, subdivision (b). (*Antonio R.*, *supra*, 76 Cal.App.5th at pp. 431–432.)

The majority declines to follow section 224.2, subdivision (b)'s language, reasoning that strict application of the statute "is absurd at best and impossible at worst." (Maj. opn. *ante*, at p. 19.) According to the majority, because the statute "facially requires that, *in every case*, inquiry be made of *at least* all" the extended family members defined in 25 U.S.C. § 1903(2), child protective agencies in certain cases will face a difficult task of tracking down large numbers of extended relatives, some of whom may be hard to locate due to the parents' refusal or inability to provide complete contact information. (Maj. opn. *ante,* at pp. 19–20.) The majority, like the dissenting justice in *H.V., supra,* 75 Cal.App.5th at pp. 439–442 (dis. opn. of Baker, Acting P. J.), believes such a hypothetical scenario is unworkable.

The majority's analysis is misguided. The issue before us isn't whether the statute would, in a hypothetical case, require a child protective agency to track down and interview an overwhelming number of relatives. That issue should be addressed in the future when, if ever, it's raised on appeal. All

7

mother argues is that the Department was required to interview three of the children's family members: M.B., R.P., and M.P. There is nothing absurd or unworkable about applying the statute to the facts of this case. (See *Antonio R., supra,* 76 Cal.App.5th at p. 436 [rejecting position raised by dissent in *H.V.* because "[t]he so-called burden on the Department (to satisfy its responsibilities) cannot justify the potential to break up Indian families given the country's history of doing just that"].) Indeed, asking each of the identified relatives about the family's possible Indian ancestry would have taken little time and effort—likely only a handful of questions that could've been asked and answered in a matter of minutes.

Nor do I agree with the majority's narrow framing of the purpose of an ICWA inquiry. Contrary to the majority's suggestion, the purpose of the initial inquiry is not to enable courts or child protective agencies to determine at the outset of a dependency proceeding whether a child has a tribal affiliation. (Maj. opn. *ante,* at pp. 25–27.) That determination can only be made by a tribe *after* the child protective agency and the court have complied with their inquiry and notice duties. (See *Isaiah W., supra,* 1 Cal.5th at p. 8; see also *T.G., supra,* 58 Cal.App.5th at p. 294 ["the question of membership is determined by the tribes, not the courts or child protective agencies"], citing *Santa Clara Pueblo v. Martinez* (1978) 436 U.S. 49, 65, fn. 21.) In fact, under section 224.2, subdivision (h), a lack of information about a child's enrollment or eligibility for enrollment in a tribe is not dispositive of the child's membership status "*unless* the tribe also confirms in writing that enrollment is a prerequisite for membership under tribal law or custom." (Italics added.)

8

Rather, the initial inquiry is intended only to yield information about a child's possible Indian ancestry that may trigger the duties to conduct further inquiry or to provide formal notice to tribes. (See § 224.2, subds. (b) [initial inquiry], (e) [further inquiry] & (f) [notice].) The threshold for triggering the duty of further inquiry—the step that often comes after the initial inquiry—is low: a child protective agency must conduct a further inquiry whenever the court or the child protective agency has a "reason to believe" that a child "is or may be" an Indian child, which exists whenever the court or agency "has information suggesting that either the parent or the child is a member or may be eligible for membership in an Indian tribe." (§ 224.2, subd. (e)(1).) A "reason to believe" exists when anyone interviewed during the initial inquiry provides information that might " ' "imply," "hint," "intimate," [or] "insinuate," ' " that a child is an Indian child. (*I.F.*, *supra*, 77 Cal.App.5th at p. 163.) Thus, it's clear the Legislature did not intend for agencies or courts to be able to determine whether a child is a member of an Indian tribe based only on the results of the initial inquiry.

The majority's narrow framing of the inquiry's purpose reflects a misconception common among courts and child protective agencies. As the California ICWA Compliance Task Force (Task Force) pointed out in its 2017 report to the Attorney General, "[a] common mistake by agencies, county counsels, court-appointed attorneys and the courts themselves is to conflate the issues of: (a) whether ICWA applies [i.e., whether ICWA's substantive provisions apply] and (b) whether notice is required under the ICWA [i.e., whether ICWA's and related state law's procedural provisions apply]." (Cal. ICWA Compliance Task Force, Rep. to Cal. Atty. Gen.'s Bur. of Children's Justice (2017)

9

p. 32 (Report).) The California Supreme Court provided guidance on this point in *Isaiah W.*, when it explained that the initial question in a child custody proceeding is " 'not whether the evidence … supports a finding that the minor[] [is an] Indian child[]; it is whether the evidence triggers the notice requirement of ICWA so that the tribes themselves may make that determination." (*Isaiah W., supra,* 1 Cal.5th at p. 15.)

In its Report, the Task Force also urged California lawmakers to address the exact problem raised in this appeal: that child protective agencies often neglect to interview extended relatives once a child's parents deny knowledge of Indian ancestry. The Task Force warned that "[w]hen parents are the sole target of the initial inquiry, it should be understood that there are a variety of reasons why relying on the parents does not necessarily protect the child's best interests, or the rights of the tribe. Parents may simply not have that information, or may possess only vague or ambiguous information. [¶] The parents or Indian custodian may be fearful to self-identify, and social workers are ill-equipped to overcome that by explaining the rights a parent or Indian custodian has under the law. Parents may even wish to avoid the tribe's participation or assumption of jurisdiction." (Report, *supra,* at p. 28; see, e.g., *Mississippi Band of Choctaw Indians v. Holyfield* (1989) 490 U.S. 30, 38–41 [mother gave birth at hospital "some 200 miles" from reservation to avoid tribal jurisdiction].)[3]

---

[3] The majority rejects the assertion that parents may not always provide reliable answers about possible Indian ancestry. (Maj. opn. *ante,* at p. 28.) Yet the majority justifies its decision not to follow section 224.2, subdivision (b)'s plain language because in some cases "parents refuse to provide [a child protective agency] with any relative

The Report is an important resource for interpreting section 224.2, as it was a catalyst for the Legislature's 2019 amendments to sections 224.2 and 224.3. (See Cal. Health & Human Services Agency, Enrolled Bill Rep. on Assem. Bill 3176 (2017–2018 Reg. Sess.) Sept. 4, 2018, pp. 5–6 [the California Tribal Families Coalition, which was created "to press for the implementation of the Task Force 2017 Report recommendations" sponsored the measure leading to the amendments' enactment]; see also Rep. to Judicial Council of Cal., Indian Child Welfare Act (ICWA): Implementation of AB 3176 for Indian Children (Sept. 5, 2019) pp. 4–5 ["On September 27, 2018, Governor Brown signed A.B. 3176 to (1) address issues identified in the task force report …"].)

Before 2019, the duty of inquiry was defined in former section 224.3. (See former § 224.3.) That statute included language like that now found in section 224.2, subdivision (a), imposing on courts and child protective agencies an "affirmative and continuing duty to inquire whether a child … is or may be an Indian child in all dependency proceedings … if the child is at risk of entering foster care or is in foster care." (Former § 224.3, subd. (a).) But unlike the current statute, former section 224.3 did not include a separate provision describing what is now known as the duty of initial inquiry. (Compare former § 224.3 with § 224.2, subd. (b).) Rather, it detailed a duty of further

---

information, making contact with extended family impossible." (Maj. opn. *ante*, at p. 19.) I don't see why, as a general rule, we should defer to parents' responses to inquiries about their knowledge of possible Indian ancestry but, at the same time, question parents' willingness to provide accurate responses seeking contact information for extended relatives.

11

inquiry, requiring a child protective agency to interview "the parents, Indian custodian, and extended family members" only when the court or agency knew or had "reason to know that an Indian child is involved." (Former § 224.3, subd. (c); see also *id.*, subd. (b) [describing circumstances "that may provide reason to know the child is an Indian child"].)

The 2019 amendments addressed the Task Force's express concerns that California law failed to ensure child protective agencies were contacting extended relatives while conducting ICWA inquiries. (See Report, *supra*, at p. 27, fn. 80 ["It is reported that the parents are frequently the only persons asked [about ICWA], and unfortunately the courts have at times affirmed this approach."].) Specifically, the Legislature made substantive changes to the inquiry requirements and moved them to section 224.2, while moving the notice requirements to section 224.3. (Assem. Bill No. 3176 (2017–2018 Reg. Sess.).) The amendments added, among other provisions, section 224.2, subdivision (b), which now describes the duty of initial inquiry and requires, as part of that inquiry, child protective agencies to interview parents and extended family members. (§ 224.2, subd. (b).) The amendments also lowered the threshold for triggering the duty of further inquiry from a "reason to know" that an Indian child is involved in a dependency proceeding to a "reason to believe" that an Indian child is involved. (Compare § 224.2, subd. (e) with former § 224.3, subd (c).)

Notably, the 2019 amendments did not limit the duty to interview extended relatives only to when the court or the child protective agency had "reason to know" an Indian child might be involved in a dependency proceeding. Nor did the amendments include any language relieving child protective agencies from

12

having to interview extended relatives once a child's parents deny knowledge of Indian ancestry or tribal membership. (See § 224.2.) Instead, the amendments greatly expanded the inquiry duty, requiring the agency to interview extended relatives whenever "a child is placed into the [agency's] temporary custody." (§ 224.2, subd. (b).)

The Legislature voted unanimously in favor of adopting these statutory changes.[4] (Sen. J. (2017–2018 Reg. Sess.) p. 5894 [39–0 in favor]; Assem. J. (2017–2018 Reg. Sess.) p. 6751 [80–0 in favor].)

I also disagree that we should defer to a juvenile court's finding that ICWA doesn't apply in cases, like this one, where the child protective agency does not dispute it failed to interview identified extended family members. The legal principles that govern a court's discretionary action are derived from the applicable law under which the discretion is conferred. (*Du-All Safety, LLC v. Superior Court* (2019) 34 Cal.App.5th 485, 495.) Thus, a trial court's discretion to make decisions concerning statutorily created rights and protections "is always delimited by the statutes governing the particular issue." (*Ibid*.) A finding or ruling that " ' "transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion." ' " (*Ibid*.)

Here, the scope of a juvenile court's authority to find ICWA doesn't apply to a child's dependency proceeding is defined by section 224.2, subdivision (i)(2). Under that provision, an ICWA

---

[4] In 2020, the Judicial Council amended rule 5.481 to align with the changes made to section 224.2. (See rule 5.481(a)(1), amended eff. Jan. 1, 2020.)

13

finding is subject to substantial evidence review if the court first determines that "proper and adequate further inquiry and due diligence *as required* in this section [i.e., section 224.2] have been conducted and there is no reason to know whether the child is an Indian child." (Italics added.) In other words, reviewing courts should only defer to a juvenile court's ICWA finding if the child protective agency has complied with its duties established by section 224.2, including the initial inquiry duty to ask parents, extended relatives, and other interested persons about the child's possible Indian ancestry. (See *In re Josiah T.* (2021) 71 Cal.App.5th 388, 402, 408 (*Josiah T.*) ["the court may not find that ICWA does not apply when the absence of evidence that a child is an Indian child results from [an agency's] inquiry that is not proper, adequate, or demonstrative of due diligence"].)

Not surprisingly, many courts have declined to defer to a finding that ICWA doesn't apply where, as here, the juvenile court failed to ensure the child protective agency complied with its inquiry duties. (See, e.g., *In re N.G.* (2018) 27 Cal.App.5th 474, 482–485 (*N.G.*) [rejecting agency's argument that substantial evidence supported court's ICWA findings and remanding matter for ICWA compliance because the agency did not document what efforts, if any, it made to ask extended family members about the child's possible Indian ancestry]; *K.T.*, *supra*, 76 Cal.App.5th at p. 744 [court shouldn't have found ICWA didn't apply because child protective agency failed to conduct an adequate inquiry into children's possible Indian ancestry]; *Josiah T.*, *supra*, 71 Cal.App.5th at p. 408 [reversed order terminating parental rights because the lack of evidence concerning the child's Indian status stemmed from the agency's failure to conduct a proper and

14

adequate inquiry under section 224.2]; see also cases applying plain language of section 224.2, subd. (b), cited *ante,* at pp. 8–9.)

Because the Department did not comply with its duty to interview the children's identified family members about their families' possible Indian ancestry, the juvenile court should not have found that ICWA doesn't apply to Ezequiel's, Dominic's, and Unique's proceedings. I therefore wouldn't defer to its ICWA finding.

Additionally, I would find prejudice in this case. Nothing in the record shows how the children's extended family members would have responded to questions about the children's possible Indian ancestry. Since the Legislature placed the burden to interview those relatives squarely on child protective agencies and courts, and not on parents or parents' counsel, any rule requiring parents to demonstrate prejudice on appeal in cases like this would be inconsistent with section 224.2's purpose and leave the interests of Indian tribes unprotected. (*A.R.*, *supra*, 77 Cal.App.5th at pp. 202, 207; see also *N.G., supra*, 27 Cal.App.5th at p. 484 [a child protective agency can't neglect its inquiry duties and " 'then claim that the sufficiency of its efforts cannot be challenged on appeal because the record is silent' "].) Indeed, those tribes have no standing to intervene in a dependency case unless Indian ancestry is first uncovered and established, and thus no way of protecting their tribal interests unless child protective agencies comply with ICWA and then notify the appropriate tribe when the inquiry reveals Indian ancestry.

Certainly, remanding the matter for ICWA compliance would delay finalizing the children's permanent plan of adoption. The required inquiry here, however, could have been conducted in significantly less time than it took to defend this appeal. In

15

any event, delaying the matter now to ensure ICWA compliance is preferable to potentially exposing a finalized adoption to collateral attack. (See *E.H.*, *supra*, 26 Cal.App.5th at p. 1072.) As our Supreme Court explained in *Isaiah W.*, the goal to provide children permanent and stable homes cannot override the "importance of properly determining a child's Indian status." (*Isaiah W.*, *supra*, 1 Cal.5th at p. 12.)

I conclude by noting that, to date, California appellate courts have developed at least four different approaches to evaluating whether error at the inquiry stage is prejudicial. (See *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777–782.) This confusion benefits no one. Because the issues raised in this appeal are of substantial importance to dependent children, the children's families, and Indian tribes, I urge the Supreme Court to review this decision and expedite briefing and preference in setting the date of oral argument. (See rule 8.512(c); § 395, subd. (a)(1).)


LAVIN, J.

16